1

2

3

4                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**
5

6

7  ELIZABETH ANNE DUNCOMBE,            )        2:07-CV-656-ECR-LRL
                                       )
8        Plaintiff,                    )
                                       )
9  vs.                                 )        **<u>Order</u>**
                                       )
10 THE ALEXANDER DAWSON SCHOOL AT      )
   RAINBOW MOUNTAIN LLC, and THE       )
11 BOARD OF TRUSTEES OF THE            )
   ALEXANDER DAWSON SCHOOL, and THE    )
12 ALEXANDER DAWSON FOUNDATION, and    )
   H. MICHAEL HUGHES, HEADMASTER, and  )
13 MARIO BORINI, CHAIR, BOARD OF       )
   TRUSTEES,                           )
14                                     )
         Defendants.                   )
15 _____)

16       Plaintiff Elizabeth Duncombe brought suit against various

17 members of the faculty and board of the Alexander Dawson School, the

18 school at which Duncombe once served as the principal of the

19 elementary school.  Duncombe alleges that though her experience with

20 the school was positive for several years, when Defendant H. Michael

21 Hughes came on as Headmaster of the school, things took a turn for

22 the worse.  Duncombe contends that Hughes created a work environment

23 that condoned the subjugation and objectification of women, which

24 was intolerable.

25       Duncombe has raised nine causes of action against the

26 defendants in this case: (1) gender discrimination in violation of

27 Title VII; (2) sex discrimination in violation of Title VII; (3)

28 retaliation under Title VII; (4) failure to prevent discrimination

1  under Title VII; (5) failure to investigate under Title VII; (6)
2  termination in violation of public policy; (7) retaliation in
3  violation of public policy; (8) hostile environment in violation of
4  public policy; and (9) intentional infliction of emotional distress.
5  Defendants the Alexander Dawson School, the Board of Trustees of the
6  School, the Alexander Dawson Foundation, and Mario Borini ("the
7  School defendants" or "the School") are named as defendants for all
8  nine causes of action.  Defendant H. Michael Hughes is now only a
9  defendant with respect to the IIED claim,[1] and the Court has already
10 granted summary judgment in his favor as to that claim.

11      Several motions are presently pending before the Court.  First
12 is the School defendants' motion (#70) for summary judgment, in
13 which the defendants seek summary judgment as to Duncombe's first
14 five causes of action on the basis that those claims are time-
15 barred.  In addition, the School defendants seek summary judgment as
16 to causes of action six through eight on the basis that public
17 policy causes of action are not viable in Nevada if there is an
18 adequate statutory remedy.  Second is the defendants' motion for
19 summary judgment (#75), in which the defendants seek summary
20 judgment as to Duncombe's claim for intentional infliction of
21 emotional distress.  Third is the School defendants' objection (#76-
22 2) to an exhibit attached to Duncombe's Opposition (#71) to the
23 motion for summary judgment (#70).  Fourth is the School defendants'
24 motion (#77) for a hearing with respect to the motion (#70) for

25 _____

26      [1]Originally, Hughes was also named as a defendant in causes of
   action six through eight, but the Court granted (#51) Hughes' motion
27 (#36) for judgment on the pleadings with respect to those claims.

28                                    2

1 summary judgment.  Last is the School defendants' motion (#93) to
2 withdraw the response that they had filed with respect to Duncombe's
3 motion to strike, which she in turn had filed with respect to the
4 School defendants' supplemental reply in support of their motion
5 (#70) for summary judgment as to the Title VII claims.

6   The motions and the objection are ripe, and we now rule on
7 them.

8

9                          **I. Background**

10  Duncombe joined the Alexander Dawson School as the head of the
11 lower (K through 5) school in 2000, the same year that the school
12 opened.  When the school opened, Mr. Stephen Bowers was the
13 headmaster, and he and Duncombe got along quite well by all
14 accounts.  In 2005, Bowers left the school and the Board of Trustees
15 hired Hughes as the next headmaster.  Hughes officially took office
16 in July 2005.

17  Duncombe and Hughes began having problems with each other from
18 the start.  Hughes repeatedly made comments that Duncombe found
19 offensive.  Duncome alleges that Hughes' comments made the work
20 environment toxic and unbearable.

21  Hughes' comments started almost immediately.  For example, in
22 June 2005, after Hughes had been hired but before he had officially
23 started work, Hughes told Duncombe that, while defending his
24 doctoral dissertation, he told a dissertation committee member that
25 he "would send her all of [his] homosexual [students]" if she would
26 "send [him] all of her conservative Christians."  Duncombe took this
27 comment to be homophobic.

28                                    3

In August 2005, at a meeting with Hughes, Duncombe, and a parent of a student, the parent commented about how she had seen a news article about Hughes and that he had a nice smile in the accompanying picture.  Hughes explained that he was smiling because the photographer "was wearing a low cut pair of pants where her thong was showing and moving all over the place [and] . . . she was just right there in my face making me smile."

At a staff meeting that month, Duncombe was explaining the "shelter in place" fire drills and informed Hughes that these drills were mandated by law.  Hughes responded by saying that "we don't want to hear from [Duncombe] anymore."  When Duncombe pressed the matter, Hughes slammed his hand down on his desk and said that "it was not the law, so [I] don't have to do that."

On August 25, 2005, at another staff meeting where the group was discussing an upcoming school barbeque, Hughes told the members of the school staff to "not wear any blouses that show any cleavage," and that they should not wear shorts if they were too old or had "cottage cheese thighs or varicose veins."

In light of these comments, in late August 2005, Duncombe complained to Human Resources about Hughes' conduct.  Pam Rung, from Human Resources, recommended that Duncombe talk to Hughes' assistant about her concerns.  Instead, Duncombe complained directly to Hughes.  Hughes then apologized to the staff for his "cottage cheese" and "varicose veins" comments, explaining that the remarks were "meant to be lighthearted and not aimed at any specific group [of] employees."

After this apology, Kate Mulligan, the head of the middle school, and Pam Rung brought a formal complaint against Hughes to the Board of Trustee's Chair, Mario Borino.  It is not clear if anything came of this complaint.  Nevertheless, Hughes continued to make comments of a sexual nature.

On September 4, 2004, at a staff meeting where Duncombe was present, Hughes discussed the breasts of another female parent and commented how "her breasts were absolutely sculptured breasts with a blouse falling to the side; I couldn't stand it anymore."  On September 26, 2005, Hughes told Duncombe that he would only meet with another particular parent in a public space because he thought that the parent was "coming on" to him.

On October 26, 2005, Hughes told his assistant, while not in Duncombe's presence, that he was glad she (Hughes' assistant) was in a meeting with Hughes and a parent, "because otherwise I just don't know how I would be able to describe [the parent's] nipples."  Also on October 26, Hughes told Duncombe that another student's mother had "large breasts" and then indicated that the mother still nursed her son and was "trying to bring him back to infancy."

On November 18, 2005, Hughes commented to Duncombe and Kate Mulligan about yet another student's mother's breasts and jean shorts that "were so short that I think that every man's tongue was hanging out of their mouths."

On November, 22, 2005, Hughes walked up to a "group of teachers," not including Duncombe, and said that the female students at the school "dress like a group of sluts, but that is understandable because their mothers do too."  The teachers, upset

5

by what Hughes had said, told Duncombe of Hughes' comment shortly
after it happened.

At sometime in 2005, Duncombe complained to Hughes about the
way in which his assistant treated the Coordinator of Admissions.
Shortly thereafter, Duncombe took an extra two days in deciding
whether to renew her contract with the school.  In light of the
delay, Hughes emailed Duncombe and told her that her delay made him
"wonder about all of this."  Duncombe took Hughes' email to mean
that Hughes did not trust her.

In November 2005, Duncombe met with a Board of Trustees member,
Charlie Sylvestri, and complained about Hughes' conduct.  Silvestri
indicated that parents had been complaining about Hughes and his
policies.  Later, Silvestri told Duncombe that there would be an
investigation into Hughes' comments.

After an internal investigation, the Board of Trustees brought
in a mediator in December 2005.  The mediator found "no wrong doing"
on anyone's part, but gave a list of suggestions, none of which
mentioned the inappropriate comments that Hughes had made.  After
the investigation and mediation, it appears that Mario Borino
continued to believe Hughes' side of the story.

Realizing that her differences with Hughes were not being
resolved and thoroughly frustrated by Hughes' refusal to change his
ways, Duncombe started to think of resigning.  The day after the
mediator visited the school, Duncombe sent an email to the mediator
thanking the mediator for her work and indicating a desire to
"begin[] discussions re: negotiating my departure before the end of
the year [2005]."

6

Duncombe tried to put together a severance time line that would let her leave before the spring semester started and give her a severance package. Duncombe had hired an attorney to help draft a separation agreement. The Board, however, was not interested in losing a principal midway through an academic year and denied her request.

In early January, Duncombe started to look for alternative employment. On January 4, 2006, Hughes consented to Duncombe visiting Nevada State College about a possible position with the college.

On January 11, 2006, Duncombe went to Hughes' office to ask Hughes how they could continue to work together. Hughes responded by slamming a hand on his desk and, in a loud voice, saying, "this meeting is over!"

On January 12, 2006, Duncombe went to her doctor, presenting with shortness of breath, dizziness, a sinus infection, and shingles. Duncombe also suffered from anxiety, lack of sleep, and panic attacks. Duncombe's doctor prescribed medication to help Duncombe sleep, treat her shingles, and help her with her panic attacks. In addition, Duncombe's doctor ordered that Duncombe take 30 days off of work. Duncombe's physician gave her a note saying that "Elizabeth has developed a serious medical condition that is preventing her from performing the essential functions of her job. She is currently under my care and will not be able to return to work for one month."

Later that day, January 12, Duncombe emailed Hughes to tell him that she would be out of work for 30 days and that she would deliver

7

her written resignation on February 13, 2006.  In addition, Duncombe
wrote to the Board of Trustees and informed them that she was
resigning effective February 13, 2006.  (Memorandum from Duncombe to
Board, Ex. I (#70-2).)  She gave her official written notice of
resignation to the Board on January 13, 2006.  (Letter from Duncombe
to Board, Ex. M (#70-2).)  Also on January 13, 2006, Duncombe
emailed Hughes and informed him that she had cleared all of her
personal belongings out of her office and had turned in her key and
parking badge.  (Email from Duncombe to Hughes, Ex. K (#70-2).)  On
January 16, 2006, she requested that she be allowed to use the
remainder of her vacation time after her medical leave, making her
"effective resignation day" March 9, 2006.  (Memorandum from
Duncombe to Hughes, Ex. N (#70-2).)

Duncombe was able to secure other employment with Nevada State
College.  She was offered a temporary contract for a part-time
position with the college commencing on January 23, 2006, and ending
on May 20, 2006.  (Ex. P (#70-2).)

On January 17, 2006, Hughes wrote a letter to the parents of
the school telling them of Duncombe's resignation.  (Letter from
Hughes to Parents, Ex. O (#70-2).)  He wrote that Duncombe left her
position because, "for personal reasons, she has decided to pursue
other professional opportunities.  I apologize for the short notice
of this announcement."  Duncombe claims that this letter was
intended to cause, and in fact did cause, her stress and damage by
making it appear that she was "deserting" the parents and the
children of the school.

8

On January 21, 2006, Duncombe wrote to Hughes to address his characterization of her departure to the parents of the school. (Ex. Q (#70-2).) Duncombe indicated that she found Hughes' comments about her "forced and unwanted departure" were "false and were obviously made with knowledge of their falsity."

Duncombe met with the Board to discuss her resignation and the condition of the school on February 2, 2006. (Duncombe Depo. at 639:22-640:1 (#70-2).) At this meeting, Duncombe again told the Board of Hughes' comments and behavior. (Id. at 647:14-648:7)

On February 3, 2006, Human Resources sent Duncombe her final paycheck, which represented her earnings through March 10, 2006. (Ex. R (#70-2).) Additionally, the school covered all of Duncombe's medical, dental, and vision benefits through the end of March.

It is not entirely clear when Duncombe started thinking about filing charges with the Equal Employment Opportunity Commission ("EEOC"). At one point in her deposition, Duncombe stated that she downloaded the EEOC forms and started to fill them out in January 2006, shortly after she submitted her letter of resignation. (Duncombe Depo. at 201:18-202:1 (#70-2).) At another time, she states that she was not considering taking action against the school even in February 2006. (Duncombe Depo. at 649:18-25 (#72).)

Regardless, Duncombe filled out her intake questionnaire with the EEOC on November 28, 2006. (Duncombe Declaration at 2 (#73).) She filed formal charges with the EEOC and the Nevada Equal Rights Commission ("NERC") on December 15, 2006. (Ex. S (#70-2).) In her filings, she indicated that she was "discharged," without reason, from her job on March 10, 2006. (Id.)

9

1    Duncombe attributes the delay between her discharge and her

2 NERC filing to her adult son's death.  (Duncombe Depo. at 202:2-4

3 (#70-2).)  Her son was in a car accident on April 9, 2006, and

4 remained in a coma for eleven weeks before passing away.  (Duncombe

5 Declaration at 2 (#73).)  Duncombe states that she "could not find

6 the strength to revisit" her Dawson experience until November 2006.

7 (Id.)

8    Duncombe received her right to sue letter from the EEOC, and

9 she filed suit (#1) in this case on May 21, 2007.  On February 19,

10 2008, the Court dismissed (#51) Duncombe's state law causes of

11 action against Hughes.  In addition, the Court ruled that Duncombe

12 could not state claims under Title VII against Hughes, as Title VII

13 applies to employers, not to supervisors.  On March 4, 2009, the

14 Court granted (#83) summary judgment in favor of Hughes with respect

15 to Duncombe's claim of intentional infliction of emotional distress.

16 Thus, there are no extant causes of action against Hughes at this

17 point in time.

18    On January 23, 2009, the School defendants filed a Motion to

19 Dismiss or in the Alternative for Partial Summary Judgment (#70),

20 seeking to dismiss Duncombe's Title VII claims on the basis that

21 they were time-barred and Duncombe's state claims on the basis that

22 they were untenable.  Duncombe filed an Opposition (#71) to the

23 motion on February 10, 2009, and the defendants filed a Reply (#76)

24 on February 24, 2009.  Attached to Duncombe's response was an

25 exhibit purporting to show that she had her initial intake interview

26 with the EEOC on November 28, 2006.  The School defendants filed an

27 objection (#76-2) to consideration of this evidence, arguing that

28                                    10

Duncombe had not disclosed it in her initial Rule 26 disclosures. Duncombe did not respond to the objection.

On February 12, 2009, the School defendants filed a Motion for Summary Judgment (#75) with respect to Duncombe's IIED cause of action. Duncombe opposed (#78) the motion on March 2, 2009. Also on March 2, 2009, the Court held a hearing with respect to Defendant Hughes' Motion for Summary Judgment (#58). On March 3, 2009, the Court granted Hughes' motion (#58), concluding no facts demonstrated that Hughes intended to cause Duncombe emotional distress with his comments. On March 23, 2009, the School defendants filed their Reply (#87), arguing in part that because the Court had granted summary judgment in Hughes' favor, the School could not be liable for an IIED claim.

## II. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. N.W. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Baqdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. FED. R. CIV. P. 50(a). Where reasonable minds could differ on the material facts at issue,

1   however, summary judgment should not be granted.  Warren v. City of

2   Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct.

3   1261 (1996).

4        The moving party bears the burden of informing the court of the

5   basis for its motion, together with evidence demonstrating the

6   absence of any genuine issue of material fact.  Celotex Corp. v.

7   Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met

8   its burden, the party opposing the motion may not rest upon mere

9   allegations or denials in the pleadings, but must set forth specific

10  facts showing that there exists a genuine issue for trial.  Anderson

11  v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the

12  parties may submit evidence in an inadmissible form - namely,

13  depositions, admissions, interrogatory answers, and affidavits -

14  only evidence which might be admissible at trial may be considered

15  by a trial court in ruling on a motion for summary judgment.  FED.

16  R. CIV. P. 56(c); Beyene v. Coleman Security Services, Inc., 854

17  F.2d 1179, 1181 (9th Cir. 1988).

18       In deciding whether to grant summary judgment, a court must

19  take three necessary steps: (1) it must determine whether a fact is

20  material; (2) it must determine whether there exists a genuine issue

21  for the trier of fact, as determined by the documents submitted to

22  the court; and (3) it must consider that evidence in light of the

23  appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary

24  judgment is not proper if material factual issues exist for trial.

25  B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir.

26  1999).  "As to materiality, only disputes over facts that might

27  affect the outcome of the suit under the governing law will properly

28                                    12

preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.
Disputes over irrelevant or unnecessary facts should not be
considered. <u>Id.</u> Where there is a complete failure of proof on an
essential element of the nonmoving party's case, all other facts
become immaterial, and the moving party is entitled to judgment as a
matter of law. <u>Celotex</u>, 477 U.S. at 323. Summary judgment is not a
disfavored procedural shortcut, but rather an integral part of the
federal rules as a whole. <u>Id.</u>

### III. Motion for Summary Judgment (#70) as to Non-IIED Claims

The School defendants seek summary judgment as to both
Duncombe's Title VII claims and her state law claims.

### A. Title VII Claims

The School's motion (#70) does not challenge the substance of
Duncombe's Title VII claims; rather, the School asserts that
Duncombe failed to present her claims to the EEOC in a timely
manner.

Duncombe has alleged that Hughes' comments created a hostile
work environment. Duncombe contends that the hostile work
environment continued until the last day she was on the school's
payroll, sometime in March 2006. The defendants argue that the
purported hostile environment had to end no later than Duncombe's
last day on campus, January 12, 2006.

Title VII makes it unlawful for an employer to discriminate
against any individual with respect to his or her "terms,
conditions, or privileges of employment" on account of the

1    employee's "race, color, religion, sex, or national origin."  42

2    U.S.C. § 2000e-2(a)(1).  "The phrase 'terms, conditions, or

3    privileges of employment' evinces a congressional intent to strike

4    at the entire spectrum of disparate treatment of men and women in

5    employment, which includes requiring people to work in a

6    discriminatorily hostile or abusive environment."  Harris v.

7    Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (some internal quotation

8    marks omitted).

9        An individual who wants to challenge an employment practice

10   under Title VII must file a charge with the EEOC within either 180

11   or 300 days of the alleged unlawful employment practice, depending

12   on whether the individual's state has an agency to handle such

13   claims.  42 U.S.C. § 2000e-5(e)(1).  In Nevada, individuals alleging

14   discrimination in the workplace generally must first present their

15   claims to the NERC, so they must file charges with the EEOC within

16   300 days of the alleged unlawful employment practice.  See id.

17       The date that starts the clock on the limitations period

18   depends on the type of claim involved.  See Nat'l R.R. Passenger

19   Corp. v. Morgan, 536 U.S. 101, 105 (2002).  With claims of discrete

20   acts of discrimination, such as termination, failure to promote, or

21   denial of transfer, the statutory period begins to run on the date

22   the discrete act happens.  Id. at 114.  With hostile work

23   environment claims, however, no one discrete act gives rise to the

24   claim; rather, the claim "is composed of a series of separate acts

25   that collectively constitute one unlawful employment practice."  Id.

26   at 117; see Porter v. Cal. Dep't of Corr., 419 F.3d 885, 894 (9th

27   Cir. 2005) (stating that the "most egregious of the harassing

28                                       14

events" need not occur within the 300-day period for a hostile

environment claim "to be actionable"); Draper v. Coeur Rochester,

Inc., 147 F.3d 1104, 1109 (9th Cir. 1998) (stating that even a

seemingly "innocuous occurrence" may contribute to a pattern of

discriminatory harassment).  It makes no difference if "some of the

component acts of the hostile work environment fall outside the

statutory time period.  Provided that an act contributing to the

claim occurs within the filing period, the entire time period may be

considered by a court for the purposes of determining liability."

Morgan, 536 U.S. at 117.

The difference in the parties' view of the timing is

significant because Duncombe filed her intake questionnaire with the

EEOC on November 28, 2006.[2]  Three hundred days prior to that date

is February 1, 2006.  Thus, if we accept the defendants' argument —

that the alleged hostile environment ended no later than January 12,

2006 — Duncombe misses the filing deadline by approximately twenty

days.

There is a genuine issue of material fact as to when Duncombe's

employment with the school ended.  She resigned at sometime in

January 2006, but she stayed on the payroll until March 2006.  She

started a new job in January 2006, but still went to meet with the

Board of Trustees on February 2, 2006, presumably to see if her job

---

[2]In O'Loghlin v. County of Orange, the Ninth Circuit used the date that the plaintiff "signed her intake questionnaire" as the date for determining whether a filing was timely.  229 F.3d 871, 873 (9th Cir. 2000).  Although O'Loghlin involved the ADA, the Ninth Circuit noted that the ADA was modeled on Title VII.  Id. at 876.  Therefore, we find the court's conclusion on the point to be persuasive, and we reject the defendants' argument that using this date is improper.

could be salvaged.  The school continued to pay her benefits through the end of March 2006.

On the one hand, it may be that Duncombe, though not physically present on the school grounds, was still subject to a hostile work environment through the actions of Hughes and the Board.  Arguably, she was still "employed" or had not yet been "constructively discharged" as of late March 2006.  It may also be that the last act of discrimination occurred on February 2, 2006, when the Board informed Duncombe that they were "sticking with" Hughes — in essence choosing Hughes over Duncombe.  In either case, Duncombe's filing would be timely: 300 days after February 2, 2006, is November 29, 2006, and as noted above, Duncombe completed her EEOC intake interview on November 28, 2006.

On the other hand, it may be that Duncombe was no longer subject to a hostile work environment after she left campus on January 12, 2006.  In that case, her filing would be untimely: 300 days from January 12, 2006, is November 8, 2006.

Given the uncertainty surrounding the date of the last act of discrimination and Duncombe's date of discharge, granting summary judgment would be inappropriate.  See Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001) (holding that the "trier of fact must resolve disputed factual issues in order to determine whether" the plaintiff was misled by the administrative office as to the time limits of his discrimination claim); Draper, 147 F.3d at 1109 (holding that a temporal determination regarding a supervisor's harassment sufficed to overcome a motion for summary judgment).

**B. Objection to Duncombe's EEOC Intake Questionnaire**

The defendants argue that Duncombe's EEOC interview date should not be considered because she did not disclose the document in her initial Rule 26 disclosures. (D.s' Objection at 5 (#76-2).) The defendants did not make this objection as a separate motion; rather, they attached the objection to their Reply (#76). The objection (#76-2) does not appear separately on the docket, and as such, the plaintiff never responded to it. The parties, however, agreed to re-open discovery so that the defendants could obtain a full set of records from the NERC and the EEOC.

Federal Rule of Civil Procedure 26(a) requires a party to disclose "all documents . . . that the disclosing party . . . may use to support its claims or defenses." Rule 26(e) imposes a duty on a party to "supplement or correct" any disclosure made under Rule 26(a). A party who fails to abide by Rule 26(a) or 26(e) is subject to sanctions under Rule 37(c)(1). A court has the authority to prevent the violating party from using this evidence at a hearing or trial. FED. R. CIV. P. 37(c)(1). However, a court may instead "impose other appropriate sanctions." Id.

In her opposition, Duncombe states in two ways that she met with the EEOC in November 2006. First, Duncombe attached a signed declaration stating that she filled out an EEOC intake questionnaire on November 28, 2006. (Duncombe Declaration at 2 (#73).) Second, Duncombe attached the pre-complaint questionnaire to her declaration, though the questionnaire could be missing its first page. (See id. at 4.) Regardless, Duncombe had not disclosed this initial intake date to the defendants prior to her opposition.

Although Duncombe did not properly disclose her intake date to the defendants, we find it appropriate to consider her declaration and intake questionnaire.  The Federal Rules are to be interpreted "to secure the just, speedy, and inexpensive determination of every action."  FED. R. CIV. P. 1.  The discovery necessary for the substance of the Title VII claims overlaps significantly with the discovery for the IIED claim.  Thus, there does not appear to be any significant additional expense or delay in time were we to overrule the objection.  It would not, however, serve justice to sustain the objection and dismiss the plaintiff's case on account of the plaintiff's oversight.

Nevertheless, we recognize that the defendants have been tactically prejudiced by Duncombe's failure.  Instead of attacking the plaintiff's claims on the merits, they chose to attack on procedural grounds.  Because of this, though we will overrule the School defendants' objection, the Court will permit the defendants to file a subsequent motion for summary judgment, should they so choose.  See Breeland v. S. Pac. Co., 231 F.2d 576, 579 (9th Cir. 1955) (permitting subsequent motion for summary judgment that raised different issues than those presented in the first motion).

**C. State Law Claims**

The School defendants next argue that Duncombe's state law claims should be dismissed.  We previously dismissed these causes of action against Defendant Hughes, reasoning that "such [actions] could only lie against Plaintiff's employer."  (Order at 3 (#51).)

18

1   The School argues that state common law causes of action are
2   not available when there is a specific statutory remedy available.
3   Duncombe argues that Nevada courts do recognize the claims of
4   termination, retaliation, and hostile environment in violation of
5   public policy.

6   As we stated in our previous Order (#51), there are two types
7   of tortious discharge under Nevada law: (1) bad faith discharge and
8   (2) wrongful discharge in violation of public policy.  (Order at 2
9   (#51).)  Court-created remedies, however, are available only when
10  "the statutory remedies are insufficient to redress the wrong that
11  has occurred."  Canada v. Boyd Group, Inc., 809 F. Supp. 771, 782
12  (D. Nev. 1992) (citing D'Angelo v. Gardner, 819 P.2d 206, 216-17
13  (Nev. 1991)); Shoen v. Amerco, Inc., 896 P.2d 469, 475 (Nev. 1995)
14  (stating "a public policy tort should not be recognized in this case
15  based on the fact that a comprehensive statutory remedy exists").

16  Here, with her sixth cause of action, Duncombe alleges that her
17  discharge violated public policy because there is a "well
18  established public policy against Termination in employment on the
19  basis of race, age, gender, disability, and national origin."  (P.'s
20  Compl. ¶ 121 (#1).)  This type of discrimination is proscribed by
21  Title VII, which provides a comprehensive statutory framework for
22  remedying such discrimination.

23  Similarly, Duncombe's seventh and eighth causes of action
24  appear to fall within the purview of Title VII.  The seventh cause
25  of action seeks redress for being terminated for protesting unlawful
26  discrimination.  (Id. ¶¶ 132-33.)  The eighth cause of action
27  alleges that Duncombe was subjected to a hostile work environment.

28

1  (Id. ¶¶ 139-41.)  Because Title VII provides a comprehensive
2  statutory remedy for the alleged causes of action, no public policy
3  torts should be recognized in this case.

4

5  **IV. Motion For Summary Judgment (#75) as to IIED Claim**

6      The Court previously granted summary judgment in favor of
7  Defendant Hughes with respect to Duncombe's intentional infliction
8  of emotional distress claim.  (Minutes of Proceedings March 2, 2009
9  (#83).)  The remaining defendants in the action now seek summary
10  judgment on the same claim, arguing that if Hughes was not liable
11  for the underlying intentional tort, then neither are they.

12      Duncombe asserts that the defendants are liable under either of
13  two theories: (1) respondeat superior: holding the employer liable
14  for the tort of its employee; or (2) holding the employer liable for
15  the reckless disregard of the probability that severe emotional
16  distress would result from the actions of one of the employer's
17  employees.

18      Both of these theories are predicated on the employee being
19  liable for the underlying tort, and thus neither theory is viable.
20  Hughes' conduct, which could be characterized as inappropriate, was
21  not directed at Duncombe such that he intended to cause her severe
22  emotional distress.

23

24  **V. Other Motions**

25      The School defendants have also moved (#77) to have a hearing
26  on the motion for summary judgment (#70).  Such a hearing will not

27

28

1 assist the Court in making its rulings on the case and is not
2 necessary.  The Court will deny this motion (#77).

3      Finally, the defendants move (#93) to withdraw their response
4 to Duncombe's motion to strike the defendants' supplemental reply
5 with respect to the School defendants' motion for summary judgment
6 (#70).  The defendants concede that the document "is not necessary
7 for the Court to rule" on the motion (#70).  The Court will grant
8 the motion to withdraw.

9
10                          **VI. Conclusion**

11      There is a genuine issue of material fact as to when the
12 plaintiff left her position.  As such, it is inappropriate declare
13 that the plaintiff missed her filing deadline and to grant summary
14 judgment in the defendants' favor.

15      The School defendants, however, are not liable for intentional
16 infliction of emotional distress because their employee was not
17 liable for the underlying tort.

18

19      **IT IS THEREFORE HEREBY ORDERED THAT** the defendants' motion for
20 summary judgment (#70) is **DENIED** in part and **GRANTED** in part.  The
21 motion (#70) is denied as to the Title VII claims.  The motion is
22 (#70) is granted as to the state law claims.

23      **IT IS FURTHER ORDERED THAT** the defendants' motion for summary
24 judgment (#75) is **GRANTED.**

25      **IT IS FURTHER ORDERED THAT** the defendants' objection (#76-2) to
26 evidence is **OVERRULED.**  The defendants may, however, choose to file
27 a subsequent motion for summary judgment as to the substance of the

28                                21

plaintiff's Title VII claims.  Any such motion must be filed by July 13, 2009.

**IT IS FURTHER ORDERED THAT** the defendants' motion (#77) for a hearing on motion (#70) is **DENIED.**

**IT IS FURTHER ORDERED THAT** the defendants' motion (#93) to withdraw their response to the plaintiff's motion to strike the defendants' supplemental reply with respect to the School defendants' motion for summary judgment (#70) is **GRANTED.**

DATED: May 6, 2009.

_Edward C. Reed._
_____
UNITED STATES DISTRICT JUDGE

22